UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IAN SEAN WOOD, | : | |
| | : | |
| Plaintiff | : | No. 4:CV-04-1693 |
| | : | |
| vs. | : | (Complaint Filed 08/02/04) |
| | : | |
| | : | (Judge Muir) |
| DR. ROMEO, et al., | : | |
| | : | |
| Defendants | : | |

**ORDER**

September 2, 2005

**BACKGROUND**

This is a civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff, Ian Sean Wood, is an inmate currently confined in the State Correctional Institution, Coal-Township, Pennsylvania. He complains of incidents which occurred at his former place of confinement, the Rockview State Correctional Institution, Bellefonte, Pennsylvania ("SCI-Rockview"). Named as defendants in the complaint are Dr. Joseph Romeo, Dr. John J. Schietroma, and the SCI-Rockview Medical Administration[1].

---

1. Defendants, SCI-Rockview Medical Administration filed an answer to the complaint on May 25, 2005. (Doc. No. 46). They currently have a motion for judgment of the pleadings pending. (Doc. No. 47). Plaintiff's motion for enlargement of time to file a brief in opposition to this motion, will be granted by separate order.

Plaintiff claims that after being attacked by another inmate on December 3, 2002, defendants were deliberately indifferent to his serious medical needs resulting from an alleged injury to his face and eye, in violation of his Eighth Amendment rights. (Doc. No. 1, complaint). Presently before the court is a motion dismiss the complaint, filed by defendant Schietroma (Doc. No. 11), and a motion to dismiss and for summary judgment[2], filed by defendant Romeo (Doc. No. 22). These motions have been fully briefed and are ripe for disposition. For the reasons that follow, the motions will be granted.

**Standard of Review**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997). All material allegations of the complaint must be

---

2. Because defendant's motion to dismiss and for summary judgment, contained matters outside of the pleadings, which could not be excluded, by Order dated December 8, 2004, defendant's motion was converted solely to a motion for summary judgment and the parties were directed to submit any additional material deemed pertinent to the motion, including a statement of material facts. (Doc. No. 33).

accepted by the Court as true and construed in favor of the plaintiff. Allah vs. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000); Shaev vs. Saper, 320 F.3d 373, 375 (3d Cir. 2003). Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. Conley vs. Gibson, 355 U.S. 41, 45-46 (1957); Lum vs. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004). However, the Court is not required to accept legal conclusions, either alleged or inferred, from the pleaded facts. Morse vs. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997). In Nami vs. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), the Court of Appeals for the Third Circuit added that when considering a motion to dismiss based on failure to state a claim, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims." When an unrepresented party is confronted by a motion to dismiss, the deciding court must be mindful of the well-settled principle that *pro se* complaints should be liberally construed, Haines vs. Kerner, 404 U.S. 519, 520 (1972), and that *pro se* litigants are to be granted leave to file a curative amended complaint "even when a plaintiff does

3

not seek leave to amend," unless such an amendment would be inequitable or futile. Alston vs. Parker, 363 F.3d 229, 235 (3d Cir. 2004). However, a complaint that sets forth facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend. Grayson vs. Mayview State Hospital, 293 F.3d 103, 106 (3d Cir. 2002); see also Estelle vs. Gamble, 429 U.S. 97, 107-108 (1976).

With respect to a motion for summary judgment, Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment " . . . forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson vs. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

4

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. <u>Anderson</u>, 477 U.S. at 248; Gray vs. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 257; Brenner vs. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore vs. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement vs. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White vs. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the

5

pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corporation vs. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. vs. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter vs. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

**Statement of Facts**

On the morning of December 3, 2002, plaintiff was struck in the left eye with a combination lock when he was attacked by another inmate. (Doc. No 1, complaint). He sustained serious bodily harm to his face and left eye. Id. He was immediately taken to the SCI-Rockview Medical Department, where at 9:50

a.m., he was evaluated by physician's assistant Bridget Kelly ("PA Kelly"). (Id., Doc. No. 28, Ex. A, Progress Notes dated 12/3/02). PA Kelly ordered Motrin for pain, ice for swelling, x-rays and around the clock observation. (Doc. No. 28, Ex. A, Progress Notes dated 12/3/04, Ex. C, Physician's Orders dated 12/3/04). Plaintiff was monitored on an hourly basis by the nursing staff. Id. At 3:30 pm, he was seen by Dr. Symons. Id. Dr. Symons ordered a CT Scan, which was performed on the morning of December 4, 2002. (Doc. No. 28, Ex. A, Progress Notes dated 12/3/02, Ex. B, copy of CT. Scan). The CT Scan confirmed multiple left sided facial fractures including "a blow-out fracture of the left orbital floor suspicious for entrapment of orbital contents. Id.

On December 4, 2002, Dr. Symons ordered an ophthalmology exam and a referral to Dr. Schietroma, noting "plastic/ocular reconstruction." (Doc. No. 28, Ex. A, Progress Notes dated 12/4/02). He also ordered plaintiff to remain in the infirmary. (Doc. No. 28, Ex. C, Physician's orders dated 12/5/02).

On December 6, 2002, plaintiff was seen by Dr. Fisher, an ophthalmologist. (Doc. No. 28, Ex. B, Consultation Record dated 12/4/02). Dr. Fisher recommended that plaintiff be seen

7

immediately by an oral surgeon and that he have a retinal consult. Id. Dr. Fisher told plaintiff that he could not perform the type of surgery that plaintiff needed, but that his partner, Dr. Schietroma, could. (Doc. No. 1, complaint at p. 2).

On December 8, 2002, Dr. Symons spoke with Dr. Collins, who explained that plaintiff had a prior injury in the early 1990's which had required extensive reconstruction involving the left orbit and left ethmoid sinus, and because of the extent of the current injury, plaintiff should be referred, as soon as possible, to Dr. Schietroma, an Ophthalmic Plastic and Reconstructive Surgeon, in Camp Hill, Pennsylvania. (Doc. No. 28, Ex. A, Progress Notes dated 12/9/02).

On December 10, 2002, plaintiff was transferred from SCI-Rockview to SCI-Camp Hill, in anticipation of his surgery. (Doc. No. 28, Ex. C, Physician's Orders dated 12/10/02). Upon entry into SCI-Camp Hill, plaintiff was admitted into the infirmary under around the clock observation. Id.

On December 11, 2002, plaintiff was transported to Pinnacle Health Hospital, where Dr. Schietroma repaired plaintiff's left orbital floor and medial wall fractures with a metal mesh

8

implant, as well as tamponed a CSF (Cerebrospinal Fluid) leak with free orbital fat. (Doc. No. 28, Ex. B, Operative Report dated 12/11/02; Summary Report dated 12/11/02; Consultation Report dated 12/11/02).

On December 12, 2002, plaintiff was seen by Dr. Schietroma for a follow-up examination in the morning and afternoon. (Doc. No. 28, Ex. B, Summary Report dated 12/12/02). On December 12, 2002, Dr. Schietroma discharged the plaintiff, noting the following:

> He does not appear to have a CSF leak. I had him keep his chin down on several occasions during the day and he had drainage from the left nose consisting of only two drops on one occasion and this may not been CSF fluid. He does not appear to have a spinal headache.
>
> I initially had Mr. Wood on Kefzol IV postoperatively. On the morning afer surgery he complained of diffuse itching of the skin. I switched him to Cipro 500 p.o. b.i.b.
>
> I am discharging Mr. Wood on Cipro 500 p.o. b.i.d., Bacitracin ophthalmic ointment to the skin incision site at the lateral canthus and in the left eye three times a day, and ice compress to the left eye for the remainder of December 12, 2002 and then switching to warm compresses four times a day to the left eye for one week. I asked that he tilt his head forward a number of time throughout the day to make sure that there is not CSF leak.
>
> In light of the CSF leak it is probably worth keeping him in the infirmary for one week to make sure that he

> does not develop a fever or signs of meningitis. I will forward a copy of this letter to Wexford should he be transferred. I will see him for follow-up in State College on December 20th or 21st.

(Doc. No. 28, Ex. B, letter to Dr. Young, SCI-Camp Hill Medical Department).

Upon his return to SCI-Camp Hill, plaintiff was admitted to the infirmary. (Doc. No. 28, Ex. A, Progress Notes dated 12/12/02). On December 17, 2002, plaintiff was returned to SCI-Rockview. (Doc. No. 28, Ex. A, Progress Notes dated 12/17/02).

Plaintiff saw Dr. Schietroma for follow-up examinations on December 20, 2002, January 17, 2003 and April 18, 2003. (Doc. No. 28, Ex. B, Consultation Records). At his April 18, 2003, follow-up visit, plaintiff complained of "bilateral nasal discharge" in which he was "treated with a fourteen-day course of oral antibiotics without success." (Doc. No. 28, Ex. B, letter from Dr. Schietroma to SCI-Rockview Medical Department). Although an x-ray taken on March 5, 2003, "did not indicate sinusitis", Dr. Schietroma suggested plaintiff have a post-operative CT Scan "in light of the possible sinusitis and the possibility of herniated soft tissue from the orbit into the maxillary sinus." Id.

10

On May 13, 2003, plaintiff underwent a post-surgical CT Scan. (Doc. No. 28, Ex. B, CT Scan). It showed that "there are now post surgical changes present in relation to the inferomedial aspect of the left orbital floor" in that "there continues to be a sizable bony defect in within the inferior wall laterally" and "there is evidence of prolapse of left orbital contents into the superior aspect of the maxillary sinus." Id.

On August 22, 2003, plaintiff was seen by Dr. Fisher for complaints of double vision. (Doc. No. 28, Ex. A, Progress Notes dated 8/22/03). Dr. Fisher recommended a consult with an ocular plastic surgeon. Id. On October 3, 2003, plaintiff again reported double vision to the SCI-Rockview medical staff. (Doc. No. 28, Ex. A, Progress Notes dated 10/3/03).

On October 16, 2003, Plaintiff was seen by Dr. Romeo concerning his double vision. (Doc. No. 28, Ex. B, Progress Notes dated 10/16/03). Dr. Romeo wrote a consult for an ocular plastic surgeon. (Doc. No. 28, Ex. A, Progress Notes dated 10/16/03; Ex. B, Consultation Authorization Letter dated 11/11/03).

11

On November 10, 2003, plaintiff was seen by Dr. Schietroma for a follow-up examination. (Doc. No. 28, Ex. B, letter from Dr. Schietroma to SCI-Rockview Medical Department). Dr. Schietroma noted the following:

> I saw Mr. Wood for follow-up on 11/10/03. As you know he underwent complex left orbit floor and medial wall repair on 12/11/02. He complains of episodic diplopia in primary position, episodic fleeting sharp pain of the left cheek. He had sinusitis in the spring which prompted a CT Scan. Unfortunately, he did not have the scan with him for review.
>
> On exam, visual acuity was 20/25/OS. Extraocular movements were full with diplopia only in extreme right and up gaze. There was marked enophthalmos measuring 6 mm.
>
> I will contact Centre Community Hospital to see if they will send me a copy of Mr. Wood's most recent CT Scan. Clearly he has insufficient support of his orbital tissue. I would recommend reexploration of the orbit and either repositioning of the metal mesh implant or addition of medpore implant material to build up the floor of the orbit.
>
> I will contact you to discuss this further.

Id. On November 11, 2003, Dr. Schietroma's consult was reviewed by Dr. John Lee. (Doc. No. 28, Ex. A, Progress Notes dated 11/11/03). Dr. Lee agreed with Dr. Schietroma as to the need to "redo left orbital fracture surgery." Id. That same day, Dr.

Romeo wrote a consult for the surgery to be performed by Dr. John Lee. Id.

On January 7, 2004, plaintiff was seen by Dr. Schietroma concerning his surgery. (Doc. No. 28, Ex. A, Progress Notes dated 1/7/04). Plaintiff was under the impression that Dr. Lee would be performing the surgery. (Doc. No. 28, Ex. B, Pinnacle Health Hospitals Patient's Refusal to Consent to Blood Transfusion, Medical Procedure, or Treatment). However, Dr. Lee, a Philadelphia physician, does not perform surgery at Pinnacle Health Hospital. Id. Plaintiff refused to have the follow-up surgery conducted by Dr. Schietroma. Id. Plaintiff was not seen personally by either Dr. Schietroma or Dr. Romeo since his refusal of surgery in January, 2004. (Doc. No. 28, Exs. A, B, and C).

**Discussion**

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse vs. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)(citing Estelle vs. Gamble, 429 U.S. 97 (1976)). In order to establish a claim under § 1983 based on the Eighth Amendment, an inmate must allege acts or omissions by prison officials sufficiently

13

harmful to evidence deliberate indifference to a serious medical need. See Spruill vs. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale vs. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003).

In the context of medical care, the relevant inquiry is whether the defendant was: (1) deliberately indifferent (the subjective element) to (2) plaintiff's serious medical needs (the objective element). Monmouth County Correctional Institution Inmates vs. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); West vs. Keve, 571 F.2d 158, 161 (3d Cir. 1979). Because only egregious acts or omissions can violate this standard, mere medical malpractice can not result in an Eighth Amendment violation, nor can disagreements over a prison physician's medical judgment. White vs. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990).

A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." Estelle vs. Gamble, 429 U.S. 97, 106, (1976). "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At

14

most it is medical malpractice." Id., 429 U.S. at 107. "Allegations of medical malpractice are not sufficient to establish a Constitutional violation." Spruill, 372 F.3d at 235. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown vs. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer vs. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer vs. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken vs. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart vs. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little vs. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.),

aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer vs. Carlson, 685 F. Supp. at 1339.

The objective component of an Eighth Amendment claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency. Hudson vs. McMillian, 503 U.S. 1 (1992). A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Johnson vs. Busby, 953 F.2d 349, 351 (8th Cir. 1991); Monmouth County Correctional Institution Inmates vs. Lanzaro, 834 F.2d at 347; Ramos vs. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981); West vs. Keve, 571 F.2d 158, 162-63 n.6 (3d Cir. 1978). The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain. See Monmouth County Correctional Institution Inmates vs. Lanzaro, 834 F.2d at 347; Archer vs. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984); Todaro vs. Ward, 565 F.2d 48, 52 (2d Cir. 1977).

A review of the documentation submitted by the defendant Romeo reveals that the plaintiff was treated extensively between December 3, 2002, the date of the assault, and January 7, 2004, the date he refused further medical treatment from Dr. Schietroma.  Plaintiff's medical records reveal that he received numerous x-rays, CT scans, evaluations by specialists, pain medication, regular evaluations by the prison staff, including physicians, nurses and physician's assistants.  (See Doc. No. 28, Ex. A, Progress Notes; Ex. B, Consultation Records; and Ex. C, Physician's Orders).  Indeed, the record establishes meaningful efforts by the defendants to provide plaintiff with necessary medical care, and an attendant mental state that falls woefully short of deliberate indifference.

The plaintiff has failed to present evidence from which a reasonable jury could conclude that the defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach.  There is insufficient proof in the record for a fair-minded jury to conclude that the defendants were deliberately indifferent to plaintiff's medical needs.  <u>See</u> <u>Estelle vs. Gamble</u>, 429 U.S. 97, 106 (1976); Monmouth County Correctional Institution Inmates vs. Lanzaro, 834 F.2d at 346;

17

West vs. Keve, 571 F.2d at 161.  Indeed, the scope and quality of medical attention that the defendants provided plaintiff precludes a finding of deliberate indifference.

The record before the court, at best, demonstrates plaintiff's disagreement with the course of his treatment, specifically, having to undergo reconstructive surgery again by Dr. Schietroma.  As such, the evidence of record can only rise to the level of mere negligence.  However, as simple negligence can not serve as a predicate to liability under § 1983, Hudson vs. Palmer, 468 U.S. 517 (1984), defendant Romeo is entitled to summary judgement and defendant Schietroma's motion to dismiss will be granted.  See White vs. Napoleon, 897 F.2d at 108-110.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant Schietroma's motion to dismiss (Doc. No. 11) is **GRANTED.**

2. The motion for summary judgment filed by defendant Romeo (Doc. No. 22) is **GRANTED.** Judgment is hereby entered in favor of defendant Romeo and against the plaintiff.

s/Malcolm Muir

---
MUIR
United States District Judge